May it please the Court, Stuart Weltman, on behalf of the plaintiffs, I will try to reserve three minutes for rebuttal. Your Honors, if we were to put a caption on the District Court's summary judgment order, perhaps the best one would be that no good deed goes unpunished. In the record below, the plaintiff submitted the expert opinion of one of the world's foremost experts on the subject of antioxidants and vitamin E. After a thorough analysis of virtually all of the relevant scientific evidence, and even some of the non-relevant scientific evidence, he rendered a definitive opinion, based upon that, that the defendants' labeling representations or that the defendants' products did not provide the represented labeling representations. Under King-Bio, that's about all we're required to do. In fact, we want to get the --- label says only that the vitamin E promotes immune function and helps support cardiovascular health. It doesn't make any claim about preventing mortality from any cause, let alone all causes. So I'm not really sure how the expert's opinion is relevant to the very limited structure function claim that's being placed on this label. Oh, I'd be happy to answer that, Your Honor. As is set forth in detail in his reports and his testimony, while there -- it's undeniable that a good bulk of his opinions come from these enormously large-scale, randomized, controlled clinical trials studying disease endpoints, these -- this is an unusual substance. It's the most studied substance in mankind. But my precise question is, the structure function claim that's being made isn't about preventing heart disease or cardiovascular disease or preventing any disease. It's a sort of generic, this will be good for you. And when -- I don't see in the expert's opinion a refutation of that specific claim. Well, Your Honor, I do, and if I try to explain to you why, I'd be happy to. He notes what the statements are on the label. He then goes through the science, and while, as I said, a good bulk is based upon these large-scale disease prevention trials, he opines, and he's the expert here, that these studies were so sensitive that if the vitamin E supplements provided any health benefits, not just the ones that are on the label here, but any benefits, they would have been found based upon this huge sample. And the fact is that they didn't. And the fact is that he's not alone. There's a consensus, as he cited, from the U.S. Preventative Task Force to the NIH to everyone. They do not, the American Heart Association, they don't recommend vitamin E supplements in any amount. And so, yes. Well, not recommending them doesn't mean that these statements are false. Well, Your Honor, the point is, is that the statements are false because they don't provide the representative benefits. And he opines --- Because these are structure function statements on the label, and the evidence seems to be about disease prevention, which is another category entirely. They just seem to be talking past each other. Well, I would say they aren't, because if you read Dr. Miller's reports, he goes through very carefully the progression of how he and others have arrived at the conclusion that benefits, no benefits from taking them. So even though it starts from these very, very large-scale, long-term clinical trial-studying disease, as he explains, if these vitamin E supplements provided any of the representative benefits on the labels, it would have been found as a result of the --- it would have been found in these studies because any sort of a negative pregnant, they don't find a benefit, and therefore, there is no benefit. That's -- Well, I think if you study something to see whether it provides a benefit, and it shows that you -- there is no benefit, and here we have not just 5,000, not just 10,000. We have 200,000 study subjects over a period of 15 years. And in large-scale studies funded by the NIH, and I can only say that he's the expert, and that's his opinion, and he provides the reasoning for why it is his opinion. I do not see why one has to disregard it just because some of it, or it starts from his analysis of, yes, large-scale studies that have disease endpoints. But as he explains, again, if the vitamin E supplements provided any of the representative benefits, it would have been found in positive results in these studies. Conversely, is there any harm caused by vitamin E in the record that was not disclosed? Well, no. He opines, because, quite frankly, he's one of the foremost experts and wrote the first, authored the first meta-analysis in, I believe, 2005 that showed that vitamin E supplements in 400 IUs or above pose a risk of harm. And other researchers took that torch. Well, there's a difference between correlation and cause, and I took those studies to be correlation and not a cause. His article says that the high-dosage vitamin E supplements may, not does, may increase all-cause mortality, but also stated that overall these supplements did not affect all-cause mortality. So there's a very slight correlation, but even Miller doesn't draw a causal connection. Well, I disagree, because, as I was saying, and I'm going to mispronounce his name, Blagojevich took the flag, so to speak, from Dr. Miller and updated the research because there were so many other studies that came in, and others did, too. Well, but his article says we are not able to determine the cause of the increased mortality. It's Bialakovich, his article. So, again, there's a slight correlation, but nobody is drawing a causal connection there. Well, I disagree. I think that Blagojevich, but I'm saying Blagojevich, that's the former governor. Sorry, but I just can't pronounce the name. This is a Belkovich. Kalakovich? Kalakovich. Well, anyway, who knows? The guy who starts with a B, we're all talking about the same guy. Yes. What they are saying is that you shouldn't take it because there's a risk of harm. And if you look even at the studies cited by defendants expert Abner, and that's, I think, probably, well, I think it's Bajalovic who presents the futility graph that you may or may not have seen in Dr. Miller's report, but it's in the Bajalovic which I think is 2015, there's so much, this substance has been studied so much that they've now determined it's futile to ever study it again statistically because there's been such a large sample. And if you look at the line, the futility line, you'll see it'll never cross the benefit line. And that's what that futility analysis is. That means that there's no benefit. That means that the labeling statements, whatever they might be, other than vitamin E400IU, if they talk about a benefit, it's got to be false. That's the science. Well, I will, I think you've hit the nub at least. As far as we're concerned, we have an expert. It's admissible evidence. He's a highly renowned expert, I think one of the world's foremost, who says that this substance doesn't provide the benefits that are represented on the label. Why that doesn't meet the test, I'm not sure. We here, as laypeople, can try to read the studies and try to interpret the data and try to interpret what the authors of the various studies that Dr. Miller and the other side cite, but that's the subject of expert testimony, not the subject of layperson's testimony or layperson's analysis. We can cherry-pick phrases from these studies and argue that he's wrong, but that's the subject of a jury. That's the subject matter of a fact-finder. We have a highly credible expert who's opined that these substances do not provide the benefits represented. That should be sufficient to go to a jury. If there are no further questions, I'll take my seat. Thank you. Roberts. Thank you, counsel. Good morning. My name is Robert Ambleman. I represent the defendant, Napelis, which I'll refer to as Nature's Bounty. This case is before the Court on an individual summary judgment ruling. And so the issue at bar is whether Paul Dockour could create a triable issue of fact concerning the actual falsity of the structure-function claims on these vitamin E supplements based on testimony and evidence that only relates to disease and death, and based on the testimony of an expert who admitted very frankly in his deposition that he wasn't interested in structure and function. He was interested in what he continually referred to as clinical endpoints, which makes sense because although he may be a renowned professor in his field, his field is not vitamin efficacy. His field is epidemiology, study of disease. And so for Dr. Miller, without an impact on disease, no claim could be made. And he couldn't have been franker about that in his testimony. Now, his point was if it — if structure helps reduce mortality rates, then fine. But if it doesn't, then there's no impact on the structure, even though it may have some structural benefits, right? Well, there's no evidence in this record that having an impact on structure and function of the immune or heart system would have a reduction in mortality from all causes, deaths, accidents, suicide, gunshot wounds, what have you. He never drew that line. And with regard to that piece of it, the mortality piece, that had to do with the immune claim, he didn't look at a single study that was designed to test whether vitamin E had an impact on immunity. And he was very honest about that. All he looked at in regard to immunity was studies related to all-cause mortality. The problem is Congress defined this notion of structure-function. And the FDA then implemented Congress's determination in the Nutrition Label and Education Act. And when Congress did that, it drew a distinction between structure-function claims and disease claims. A disease claim requires evidence of an impact on disease or a disease state. And the FDA, even in its final rule implementing this statutory provision that's at issue, said if the claim is that a substance has an impact on disease, where you have disease studies that support it, that's called medicine. It's a drug under the law. Congress determined that it would be useful for consumers to know about impacts short of disease, where things aren't drugs. The problem with Dr. Miller's testimony is you can't take it, you can't separate it from his premise. And his premise was you cannot make a claim with regard to heart health unless you have a reduction in cardiovascular disease. And you cannot have a claim with regard to immunity unless you have a reduction in infection. I mean, it's in his portion of this testimony, and this is in the record. We included it at SER. I think it's like 218, 219, 220, where I said to him, are you saying that in order to make the claims on this label, vitamin E supplements would have to work like medicine? And he said yes, that's right. Because in his view, as an epidemiologist, unless there's an impact on disease, it's irrelevant. The problem is he didn't know what a structure-function claim was. And he admitted he made no effort to familiarize himself with that. It's just not his area. So there's a certain logic to that position, and that is the line that the statute and the regulations have drawn seems somewhat odd when you first think about it. There's, you know, but it does draw that line. And is there any sort of logical connection? Opposing counsel said that Dr. Miller testified that there is no health benefit of any kind. Is that a correct interpretation? And if so, what do we do with that? Right. I think that that's a little bit of a lawyer's spin on what the testimony was, because when you look at Dr. Miller's testimony, what he meant by that when I pressed him on it is it doesn't impact disease. He actually conceded that vitamin E supplementation has an impact on structures and functions of the immune and health system. And I even said to him, is it possible that vitamin E could have an impact on the function of the immune system without having a reduction in disease? And he said yes. I think it's at SER 211. So he concedes that. And what we provided, it wasn't our burden in this case, but what we provided in this case was evidence. And I really encourage the court to look at Dr. Bruno's declaration. It's at ER 149 through probably 152, where he explains exactly what the impacts are with regard to vitamin E on immune and heart health. It reduces lipid oxidation of LDL cholesterol. It has an antioxidant impact, reduces inflammation, which is important for both immune and heart function. It promotes the function of these monocyte cells, which are important for immune function. Improves the structure of endothelial cells, endothelial lining, which is part of the cardiovascular system. And those were also supported by randomized controlled studies of supplements. One meta-analysis of 46 different large-scale RCTs. And Dr. Miller didn't really contest any of that. I went through with him and I said, well, does vitamin E have these impacts of, you know, improving endothelial cells? He said yes. In fact, he even said that that's a fair surrogate endpoint for heart health. But then he said, but there's been epidemiological failures with regard to these surrogate endpoints. I said, well, what do you mean by that? He said, it doesn't impact disease. And so everything circles back with Dr. Miller to his view that if you don't have an impact on disease, you can't make a structure functioning claim. And that really is directly contrary to the statutory framework as implemented by the FDA. May I turn to a different subject, which is the high-dose risk pose that Dr. Miller testified to. It is true that there's nothing in the record about causation, but there is in the record a statistically significant correlation. Why isn't that enough? I mean, correlation, we know correlation by itself would not be enough, but if it's statistically significant, and that's what the evidence says, why isn't that enough to create a genuine issue of fact? I'm glad you raised it, because I really think that the whole harm issue is a red herring in this case. The label doesn't say anything about that mortality one way or another. It's not a failure-to-warn case. That's not what's alleged. So I'm not sure it has anything to do with the specific label claims. It's also not the evidence. So he cites these two meta-analyses, but he didn't consider the four other meta-analyses that were conducted afterwards that concluded differently. He didn't consider the fact that that's the factual dispute. But it's more than that. No, I mean, the question is, do they have enough to show that the label was misleading? No, they don't. Go ahead. They don't, because the label doesn't say anything about that. But also, on this issue of harm, if I can, the National Academy of Sciences, which used to be called the IOM or the Institute of Medicine, publishes what Dr. Miller agreed was an authoritative standard for the safe upper limits for vitamin E, and it was 100 times what he claimed was safe. So there's no scientific support for what he said. If you look at the NIH fact sheet, which, again, is in the record at SER 199 and 200 and at 200, the NIH specifically talks about Dr. Miller's study and the Jackalidge study. That's rebuttal evidence. You know, we're at the summary judgment stage. I'm not quarreling with you about what the proof ultimately might be. But the question is, are the studies that he cites sufficient to overcome or create a genuine issue of material fact? And you're answering my question, no, because we have other evidence. No, but it's more than that, because if you look at the NIH fact sheet, and he said the NIH was authoritative. The NIH says the studies that Dr. Miller's study looked at were of older people who were sick, many of whom were in developing countries with nutritional problems. The NIH says if you look at the subpopulation of healthy people within those studies, that there's absolutely no harm from vitamin E. So I think you can't create an issue of fact where you have an outlier. And what he's done is, regardless of the nationalism of that study. Well, it's not really an outlier. What you're saying is that it's self-contradictory, because he says, look at NIH as being definitive, but then I don't agree with them. Yeah. And NIH gives reasons, right? It's not just that they're – it's not an argument from authority alone. What NIH says is you can't draw – good science doesn't allow you to draw the conclusion he draws. And this is true of his disease studies, too, because those studies only look at sick, at-risk, older people. Dr. Miller said you cannot generalize as a matter of good science unless the populations match. One of the problems was he generalized from sick – studies of all sick populations to the healthy population. Let me ask you a different question about that. Let's, for the sake of this question, assume that there is evidence that a high dosage is correlated with all-cause mortality or other form of harm. Would the label be false if there were such evidence? It wouldn't be, because all this label says, the specific label at issue, which I think it's notable that Mr. Docker hasn't given the court the label. The label we provided is at 187. It says, promotes immune function and healthy heart. That's not proven false by, even if it were true, a small impact on death from all causes. Now, I still think there's something facially absurd with the notion that a vitamin E supplement that anyone believes it will make you live longer. But I'd also go back to Mr. Docker's testimony, the plaintiff's testimony. But the label simply says supports immune function and helps support cardiovascular health. That's it. That's not the actual label. So he didn't buy the 400 IU unit. He bought the 1,000. He's looking at the 400. That's what the 400 says. Right. But he didn't buy that. He bought the 1,000. And they specifically didn't give you the label on what he bought. And it was an exhibit on their amended complaint. They include the amended complaint, but not the exhibits. And that's why we provided it at SCR 187. And what it specifically said was promotes immune function and healthy heart. And that's all. But I think the claim was as to the immune function. That's the ‑‑ Right. But Dr. Miller ‑‑ May I finish the question? Yes. Sorry. I think that is the issue in the case, is whether or not the increased risk has to do with the immune system claim. And there's just no evidence drawing that line. There's none. I mean, what he cites is studies of disease of sick people. And, by the way, Dr. Miller at ER 27 in his rebuttal report says it is a bedrock principle of science. You cannot draw any conclusion from a study that doesn't have as a predetermined end point the matter you're trying to conclude. And none of the studies, none of the studies were looking ‑‑ that he reviewed in his meta‑analysis were considering immune function of vitamin E. So he is violating what he said was the basic rules of science. He's relying on studies that weren't designed to study anything short of disease or death. The label doesn't make claims about that. And with regard to immunity, Your Honor, he said, I don't think you can make a true, not misleading statement about immunity unless you reduce infection and it works like medicine. That's why he's then able to draw these other conclusions back from that. That's his premise. It is fundamentally different than the premise that Congress mandates. And if I can, just in the short period I have left, I'd like to ask the Court to take a hard look at the preemption argument that we've offered as an alternative ground here. And it's not a general broad ruling on preemption. It's a very specific ruling. You could have a structure function claim that is challenged as false and misleading under State law if you had evidence that challenged the actual substance of the claim. What you can't do is have a challenge to a structure function claim based on evidence concerning disease and death, because Congress and the FDA have said that's not what's required. All you need to do is show an impact on lesser events, what he's calling surrogate endpoints. Otherwise, it's a drug. Otherwise, it's medicine. And I understand that Dr. Miller thinks that it has to be, but that is a non-identical standard. You know, a company like Nature's Bounty or any of these vitamin companies, they do business around the world and around the country. And Congress made a determination here that there should be a uniform set of rules that apply. What they're asking in this case is really that you drop away. I mean, they say it in the reply brief, in essence. It doesn't matter if it's structure function or disease, they say. Just look at Dr. Miller. But it does matter because those are the rules under which the statements were made. And Nature's Bounty had a right to rely on a safe harbor within those rules. What the plaintiff is attempting to do in this case is to impose a different set of rules, divorced from the specifics of this label, divorced from the regulatory regime in which it was written. Thank you, counsel. Thank you. I will try to talk quickly. First off is the preemption. As we set forth in the footnote in our brief, it's real and open questions to whether there's a safe harbor for the statements that defendants make. And I submit that based upon the brief. I think one of the points that maybe is the 800-pound gorilla in the room here is that these statements, promotes immune health or supports immunity, helps a healthy heart or whatever it is, supports a healthy heart, these are borderline statements that really go. When you say health or you say immune, you're coming right up to the line of whether or not you're making a disease claim or not. So I just want to point that out because that's why the science crosses over a little. And I would submit that you've heard counsel make some statements about what Dr. Miller testified about. I don't think that those are accurate statements. I think if you take a look at his testimony as a whole and even the snippets they cite that he doesn't say what they say. Moreover, the defendants' experts cited disease studies in support of the labeling claims. If it's sauce for the goose, it's sauce for the gander. You can't now argue that it was wrong to go there. The fact is, is that proves that experts in this field go to that to determine whether or not these labeling claims are supported by the science or not. It is true that Dr. Miller said that immunity health is tied to the prevention of sickness. It's the definition. You can't avoid it. And therefore, the most potent proof that this doesn't cause immune health or help immune health is the all-cause mortality analyses. And counsel focuses in on Dr. Miller's 2005 report. Others have updated this and included healthy populations in it. His was the first report. Vajalovic included all the studies, including healthy populations, and reached this conclusion. Furthermore, there's a good reason why Dr. Miller didn't know what a structure function claim is. He's not an FDA expert. He's a scientist. He opines on whether things work as they are represented. That's what he's done for his entire career. So he's not there to say, well, it's a structure function claim or it's a disease claim. He's there to say whether or not it works as represented, and he said it didn't. Now, let's go to these supposed endpoints, the mechanistic endpoints, as discussed in our brief, such as the lowering of oxidation of lipids and the like. Well, first off, Dr. Miller was one of the first to research this. And they were enthused when they first found the statistical function. But then they went, it's directly related to the prevention of heart disease. It is a biomarker of heart disease. In fact, their own expert admitted it. So when you want to see whether or not what you've seen in terms of a mechanistic effect really has a health effect, you look to see what it's related to. So, for instance, a function that's supposedly related to lowering the risk of arthrosclerosis, well, you've got to look to see whether there's arthrosclerosis. Does it have an effect on that? And what Dr. Miller said is while they had great promise when they first saw this, it turned out to be a false lead. It doesn't do what it says it does. So with that, Your Honor, I think, Your Honors, I think we've at least delineated the differences between the two sides. Thank you very much. Thank you, counsel. The case just argued will be submitted for decision.
judges: Thomas, Graber, Kobayashi